IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

BRADLEY SCHNEIDER,           )
                             )
        Plaintiff,           )
                             )
v.                           )     CIVIL ACTION NO. 96-JEO-3184-W
                             )
BRENT INDUSTRIES, INC.,      )
and ROYCE EARL WILLIE,       )
                             )
        Defendants.          )

## MEMORANDUM OPINION

In this action, the plaintiff Bradley Schneider (Schneider), a former employee of

the defendants, Brent Industries, Inc. (Brent Industries) and Royce Earl Willie (Willie),

asserts claims against Brent Industries that he was sexually harassed and then discharged

for retaliatory reasons, all in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.* The complaint also contains claims under state law for outrage,

invasion of privacy, and breach of contract against both Brent Industries and Willie.

Presently before the court is the defendants' motion for summary judgment as to all the

claims. Upon due consideration, the motion is hereby granted in part and denied in

part.

## I. BACKGROUND

On June 1, 1995, Schneider began working for Brent Industries. Willie was the

Chief Executive Officer of the company which cleans and reconditions work gloves and

*40*

shop and print towels. The company operated plants in Brent, Alabama, and Bartlesville, Oklahoma. It also had a depot in Toledo, Ohio, and a warehouse in Springhill, Tennessee.

Schneider was hired with the expectation that he would become the Plant Manager of a new facility when it opened in Toledo. He was informed that he would train at the Brent plant for at least three months under the supervision of Robert Roy, the Divisional Operation Manager, and that he would be instrumental in the setup of the Toledo operation which the company intended to complete by the end of the third quarter of 1995. In his offer of employment that included his compensation and benefits, Brent Industries enumerated the terms as follows:

1.    Salary of $775.00 per week - $40,300.00 a year.

2.    We will pay you $675.00 a week here in Alabama until your training is completed. When you move to the Toledo, Ohio operation your pay will automatically be adjusted to $775.00 weekly. Reason being is that Brent Industries will pay 100% of your living expenses (average $35.84 per night Winwood Motel local). Rather than the cost as first offered you. Responsibility to pay for your cost of meals and gasoline will be yours.

3.    We will move you from Indianapolis to Toledo, OH and store your personal belongings in a Moving Companies [sic] warehouse until such time that your training in Alabama is completed and you take on the responsibility of the Toledo operation.

(Plaintiff's Exhibits In Opposition To Defendants' Motion For Summary Judgment, No. 12, (Plaintiff's Ex. 12)).

Schneider alleges that less than a month after his June 1, 1995, arrival in Alabama, Willie began sexually harassing him by subjecting him to lewd comments and actions, unwarranted touching, and sexual advances. Schneider asserts that it started when Willie invited him over to his house for dinner to talk with him. Willie told him that since it might look a "little weird" for just the two of them to be there, he would invite everybody over for an impromptu eat and swim party. (Plaintiff's Ex. 1, p. 87). Towards the end of the party, as Schneider was leaving, Willie asked him to stay. When they started talking, Willie immediately asked Schneider why he was not married. Schneider replied that he had not found the right girl. Willie said that was "bullshit. If you wanted to be married you could be." (Plaintiff's Ex. 1, p. 87). Willie asked him if he had "ever thought about having sex with men." (*Id.* at 88). Willie then asked Schneider whether he had ever thought about being with a man and a woman at the same time. (*Id.* at 89). Schneider was uncomfortable with the questioning and left.

Approximately a week or two later, Willie called Schneider at his motel and invited him over to his house. Schneider went to the house and, while they were watching a John Wayne movie, Schneider mentioned something about James Caan, Robert Mitchum, and John Wayne being in the same movie. Willie then asked Schneider if he was "turned on" by having three big men like that in a movie. Schneider interpreted this as having sexual connotations and told Willie that was not what he was thinking about. (*Id.* at 92). Later that evening, Willie and Schneider were playing pool

3

at the house.  When Schneider picked up some pool balls and began juggling them, Willie asked him if he had been juggling balls long.  Willie acknowledges in his deposition that he was "probably" talking about male testicles when he said this. (Plaintiff's Ex. 2, p. 200).  Later on, while Schneider was playing pool, he had a shot which required a shorter pool stick due to the configuration of the room.  Schneider stated that he needed a shorter stick and Willie responded, "I have got a shorter stick for you.  And he grabbed his crotch, spread his legs and grabbed his crotch." (Plaintiff's Ex. 1, p. 93).  Willie also stated: "That's the story of my life." (Plaintiff's Ex. 2, p. 201). Willie explained this at his deposition stating: "That he was just kidding.  That's the story of my life.  I got a small dick." (*Id.*).

In early August, Schneider came to work with a stiff neck.  He was talking to Roy in his office when Willie entered.  Willie noticed that Schneider was having difficulty turning his head and Willie asked what was wrong.  When Schneider told him, Willie stated that he was "pretty good at getting rid of that kind of stuff, giving back rubs." (Plaintiff's Ex. 1, p. 100).  Schneider said no, "that's okay, it will go away," but Willie walked up behind him and gave him a back and neck rub. (*Id.* at 100-101).  Schneider was uncomfortable but allowed him to continue because Roy was there and Willie was the owner of the company and his "true boss." (*Id.*).

Schneider went to Roy in mid-August to complain that Willie was sexually harassing him.  Schneider provided various examples.  Roy told him to stay away from

4

Willie outside of work.  Schneider also reported the incidents involving the party and the massage to David Watkins who was the plant manager and Willie's step son-in-law.[1] Willie found out during a company picnic shortly before Labor Day that Schneider had complained about the incidents.  He confronted Schneider as he was on the way to his car.  Willie asked why he was telling people these kinds of things and trying to ruin him. Willie then told him he could leave.  Willie's wife saw the encounter and later that evening Willie talked with her about his confrontation with Schneider that day.  Willie told her about Schneider's accusation that he "was trying to come onto him." (Plaintiff's Ex. 2, p. 217).  This and other personal items led to "one hell of a fight" that night between Willie and his wife.  (Plaintiff's Ex. 2, pp. 216-218).

Willie left for Toledo shortly after this.  His wife filed for divorce.  Willie called Schneider in mid-September wanting to know why Schneider had made these comments. During the conversation, Willie stated he had "had homosexual relationships, I am bisexual, you know, but I never hit on you.  Frankly you are not my type." (Plaintiff's Ex. 1, p. 105).  He went on to complain that his wife was divorcing him because of Schneider, and he stated that he was going to bring Schneider into the divorce lawsuit because it was Schneider's fault.  (*Id.* at 107).

In a September 19, 1995, memo to Charles Miller, the President of Brent

---

[1] Brent Industries had a paragraph in its "General Rules and Principles" prohibiting sexual harassment.  However, the record fails to show that any reporting or disciplinary procedures were in place.  (Plaintiff's Ex. 5, p. 3).

Industries, Schneider inquired about the additional responsibilities given to him after the departure of other company employees. (Plaintiff's Ex. 1, pp. 109-114). Miller is Willie's son-in-law. (Plaintiff's Ex. 2, pp. 53-54). When Schneider talked with Miller about the memo, Schneider told him that he wanted to know where he stood in regard to his allegations of sexual harassment by Willie. Schneider was concerned that he might be fired when Willie came back to Brent from Toledo. According to Schneider, Miller stopped him and said he did not want to talk about it as Willie was family. (Plaintiff's Ex. 1, pp. 115-116).

On a mid-September weekend, Schneider was working at the plant when he had a conversation with Mike Culliton, the Human Resources Director. According to Schneider, Culliton told him that Willie was a complex individual who was so intelligent "that he cannot be, he can't be happy with what 'normal people' are happy with. And sometimes that includes his sex life. Sometimes he has sex with men to spice up life as it were." (Plaintiff's Ex. 1, pp. 157-158). When Schneider asked Culliton why he was telling him this, Culliton responded that "he felt that if I can get through this current situation, as he put it, that I was in with Mr. Willie. If I could get Mr. Willie on my [sic] good side and learn to play the game that I could go places with Brent Industries." (*Id.*).

During September, Schneider began looking for other work as he perceived "that they were pushing me out. They were making it obvious that they wanted me gone.

They wanted me to quit, and so I had to have a job and I started looking." (Plaintiff's Ex. 1, pp. 121-122). After Willie returned to Brent, he, Miller, and Schneider met on October 30 to discuss Schneider's performance. According to Schneider, they told him that he was not doing anything right. They also talked about Schneider moving out of the hotel. Culliton testified at his deposition that he had no performance problems with Schneider as the plant manager. As far as he was able to tell, Schneider was doing a good job and he did not hear complaints about Schneider's performance from anyone, including Willie. (Plaintiff's Ex. 3, pp. 72-73).

About November 12 or 13, the company informed the hotel that they were no longer going to be responsible for Schneider's bill. Schneider asserts that this was retaliation for making the harassment claim against Willie. The defendants assert that this was due to the fact that the Toledo plant was not going to open as expected and expenses needed to be cut. (Plaintiff's Ex. 2, p. 264; Defendants' Motion for Summary Judgment, p. 8). Defendants also state that, by this point, they had increased Schneider's pay as discussed in the original letter of employment and had arranged to get him an apartment in Brent. (Plaintiff's Ex. 1, p. 142; Ex. 2, pp. 264-266; Ex. 12). Schneider does not dispute this.

In mid-November, Schneider was provided a November 14, 1995, memo from Culliton concerning a meeting Culliton and Miller, as well as others with Brent Industries, had with Willie to discuss Willie's dissatisfaction with the housekeeping,

7

maintenance, and general lack of supervision in the Brent facility.  (Plaintiff's Ex. 7).

The memo memorialized Willie's concerns.  (*Id.*).  The memo noted that "the group was

in agreement on several issues that Mr. Willie covered and also felt that written

documentation itemizing the areas of displeasure is warranted." (*Id.*).  Schneider asserts

that this memo was also in retaliation for his complaints, citing that the company does

not give salaried employees written warnings.  Culliton testified at his deposition:

> Traditionally we don't try to put written warnings in salaried employees
> [sic] files based on the fact that normally when you speak to someone
> that's in a salaried position that does have some responsibility and
> authority, that talking to is normally all that's necessary. You consider
> they're self motivated individuals.

(Plaintiff's Ex. 3, p. 70).  He also stated that he could not recall putting any written

warnings in any other salaried employee's file.  (*Id.*).  Nor could he recall seeing written

warnings in any salaried employee's file.  (*Id.* at 70-71).

Schneider was terminated from Brent Industries on December 12, 1995.  He

claims it was retaliation.  According to the defendants, he was terminated for business

reasons, particularly due to a loss of business. (Plaintiff's Ex. 2, p. 272; Ex. 3, p. 77; Ex.

10).  A Brent Industries document listing employees terminated in 1995 states that

Schneider was terminated due to management restructuring.  (Plaintiff's Ex. 9).  His

"Final Wage Report" states the reason for his final wages was "corporate restructuring

resulted in elimination of position."  (Plaintiff's Ex. 8).  Schneider asserts that the

position he held, plant manager, was not eliminated.  (Plaintiff's Brief in Opposition, p.

8

10, Plaintiff's Ex. 3, p. 77). Instead, it was filled by another employee.

The memo concerning the termination initially noted that Brent Industries intended to pay Schneider until December 31, 1995. It then provides that after Schneider informed them of the threat of litigation concerning his sexual harassment claims, Brent Industries, upon the advice of counsel, would cease his compensation after December 12. (Plaintiff's Ex. 10). They did, however, pay Schneider until December 31, 1995.

Schneider alleges that Willie had made sexual advances or had sexual encounters with at least three other Brent Industries employees before the events giving rise to this action. Willie gave the first employee a massage, including his genitals, at a motel while he was unclothed. (Plaintiff's Ex. 4, pp. 32-36). Willie allegedly performed similar acts on two other occasions with this employee, once at Willie's home and once on a trip from Tuscaloosa. (Plaintiff's Ex. 4, pp. 38-41).   On the trip from Tuscaloosa, Willie attempted to perform oral sex on the employee. (*Id.* at 41). These incidents allegedly occurred in the late 1980s. (*Id.* at 53). Willie allegedly asked another male employee while he was staying in Willie's motor home some personal questions about his marital status and asked him about going to "a gay bar." (Plaintiff's Ex. 15, p. 2).   Willie offered the employee the opportunity to "sleep with" him that night at the motor home. (*Id.*). The employee alleges that when he declined, Willie appeared frustrated. He alleges that Willie later retaliated by demoting him, according to Willie, "because [he]

9

didn't kiss enough ass." (*Id.*).    Finally, Willie allegedly had contact with a third employee after that employee joined Brent Industries in 1992. (Plaintiff's Ex. 11 and 13, which are under seal). [2]

## II. DEFENDANTS' OBJECTIONS TO CERTAIN EVIDENCE

The defendants object to several portions of statements in two declarations filed by the plaintiff and request that they be struck.    The defendants claim that the statements constitute inadmissible hearsay.    Rule 56(e) of the *Federal Rules of Civil Procedure* provides that affidavits opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."    Inadmissible hearsay thus cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial.    *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, *amended in part on reh'g*, 102 F.3d 1118 (11ᵗʰ Cir. 1996), *cert. denied*, ___U.S.___, 117 S. Ct. 2453 (1997). An affidavit submitted in connection with a motion for summary judgment may contain hearsay statements that would be admissible at trial under exceptions to the hearsay rule. *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-455 (2d Cir. 1991).

---

[2] This material is available for review but will not be discussed further to comply with the granting of the defendants' motion to seal plaintiff's exhibits numbered 11 and 13.  The defendants' exhibits (numbers 5 through 7) regarding that matter are also under seal.

The first material that the defendants object to is in the declaration of the plaintiff. They claim the declaration contains hearsay statements attributed to Roy and Culliton and should be stricken. They offer no additional specificity as to exactly which portions they object. The declaration provides:

> Finally, in August I told Robert Roy that Mr. Willie was trying to get me to have sex with him, and I told him examples to support what I believed. I asked Mr. Roy what I should do about Mr. Willie. *Mr. Roy told me to stay away from Mr. Willie outside of work.* I told Mr. Roy that after Mr. Willie first came onto me I had tried to stay away from him outside of work, but Mr. Willie insisted that I see him. I told Mr. Roy that because Mr. Willie was my boss and the owner, I had to do what he said.
>
> Not long after I reported Mr. Willie, *Mr. Roy told me he had told other managers about what Mr. Willie had done to me.*

(Plaintiff's Ex. A., pp. 4-5)(emphasis added). *Fed. R. Evid.* 801(d)(2)(D) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ." *Fed. R. Evid.* 801(d)(2)(D). As Mr. Roy was the Divisional Operation Manager at Brent Industries and these statements arguably concern matters within the scope of his employment, they are not due to be struck under Rule 801(d)(2)(D).

The declaration also provides:

> In the middle of September the Personnel Director/Human Resources Director, Mike Culliton, told me that *Mr. Willie is a complex individual who is "so intelligent that he just cannot be happy with what makes 'normal people' happy. And sometimes that includes his sex life. Sometimes he has sex with men to spice up life."* I asked Culliton why he was telling me this and Culliton told

> me *if "you could get through the current situation that you are in with Mr. Willie
> and get Mr. Willie on your good side and learn to play the game, you could go places
> with Brent Industries."* Culliton was telling me in order to advance at Brent
> Industries, I had to have sex with Mr. Willie. If I did not "play the game"
> with Mr. Willie, Culliton was obviously stating I would not advance and
> would possibly lose my job.

(Plaintiff's Ex. A., p. 6)(emphasis added). As Culliton was the Human Resources

Director, these statements also concern matters within the scope of his employment and

are not hearsay. However, Schneider's conclusion is speculation and due to be struck.

The second material the defendants object to is in the declaration of Terry

Duncan. Specifically, they object to the following:

> I reported to a supervisor that Mr. Willie had tried to sleep with me, but
> that supervisor showed he simply accepted Mr. Willie's actions as part of
> the job and he offered no solution to the problem other than to say that
> *'Royce [Mr. Willie] goes both ways.'* I was laid off for no reason not long after
> talking to that supervisor.

(Plaintiff's Ex. 15, p. 2; Objection of Defendants', pp. 1-2)(emphasis added). They claim

it is inadmissible hearsay and that it lacks attribution. Since the witness fails to

attribute the statement to a particular individual, the court cannot determine whether

or not it was made by an agent concerning a matter in the scope of his or her authority.

The objection to this statement is thus due to be granted and the statement struck.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the declarations, if any, show

that there is no genuine issue as to any material fact and that the moving party is

12

entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-323; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

14

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

## IV. SEXUAL HARASSMENT

Under the plain language of Title VII of the Civil Rights Act, employment discrimination or harassment based on an individual's sex is prohibited.[3] Two forms of

---

[3]  42 U.S.C. § 2000e-2(a)(1) provides in pertinent part:

> It shall be unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's ... sex.

15

sexual harassment have been recognized by the courts: explicit sexual overtures that are directly linked to employment opportunities or conditions, which is commonly referred to as *quid pro quo* harassment; and conduct that creates a hostile, abusive or offensive work environment. *Burlington Industries, Inc. v. Ellerth,* ___U.S.___, 118 S. Ct. 2257, 2264, 141 L. Ed. 2d 633 (1998); *Sims v. Montgomery County Commission,* 766 F. Supp. 1052, 1067 (M.D. Ala. 1990).

### A. Hostile Work Environment

Discriminatory conduct results in a hostile work environment when it is "so severe or pervasive that it create[s] a work environment abusive to employees because of their ... gender." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). To establish a claim, the plaintiff must show that: (1) he or she belongs to a protected class, (2) he or she was subjected to unwelcome sexual harassment, (3) the harassment was based on his or her sex, and (4) the harassment affected a term, condition, or privilege of employment in that it was "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557 (11th Cir. 1987). Additionally, in order to hold the employer liable on a Title VII hostile work environment claim, the plaintiff must show either: (1) that "the individual charged with creating the abusive environment was . . . indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," (*Faragher v. City*

*of Boca Raton,* ___U.S.___, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998)) or (2) that

the company is vicariously able for the actions of "a supervisor with immediate (or

successively higher) authority over the employee" (*Id.* at *2292).* As stated by the Court

in *Faragher:*

> When no tangible employment action is taken, a defending employer may
> raise an affirmative defense to liability or damages, subject to proof by a
> preponderance of the evidence.  The defense comprises two necessary
> elements: (a) that the employer exercised reasonable care to prevent and
> correct promptly any sexually harassing behavior, and (b) that the plaintiff
> employee unreasonably failed to take advantage of any preventive or
> corrective opportunities provided by the employer or to avoid harm
> otherwise.   While proof that an employer had promulgated an
> antiharassment policy with complaint procedure is not necessary in every
> instance as a matter of law, the need for a stated policy suitable to the
> employment circumstances may appropriately be addressed.  And while
> proof that an employee failed to fulfill the corresponding obligation of
> reasonable care to avoid harm is not limited to showing an unreasonable
> failure to use any complaint procedure provided by the employer.  No
> affirmative defense is available, however, when the supervisor's harassment
> culminates in a tangible employment action, such as discharge, demotion,
> or undesirable reassignment.

*Faragher,* 118 S. Ct. 2292-2293 (citations omitted).

The court is required to examine the totality of the circumstances since a hostile

environment claim "is a single cause of action rather than a sum total of a number of

mutually distinct causes of action to be judged each on the merits." *Vance v. Southern

Bell Telephone & Telegraph Co.,* 863 F.2d 1503, 1511 (11th Cir. 1989).  *See also Oncale v.

Sundower Offshore Services,* ___U.S.___, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).  The

determination of whether a defendant's conduct is sufficiently severe and pervasive to

create a hostile environment requires an examination of the frequency and gravity of the incidents. *Vance,* 863 F.2d at 1510. The environment must be "objectively hostile or abusive" and "subjectively perceived by the victim to be abusive." *Harris,* 510 U.S. at 21.

Concerning the first criteria, whether the plaintiff belongs to a protected class, the United States Supreme Court recently has stated that "nothing in Title VII necessarily bars a claim of discrimination 'because of ... sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Oncale,* 118 S. Ct. at 1001. Plaintiff Schneider therefore is part of a protected class.

Concerning the second criteria, whether the plaintiff was subjected to unwelcome sexual harassment, the court "must examine 'the totality of the circumstances, such as the nature of the sexual advances and the context in which they occurred.'" *Brassfield,* 953 F. Supp. at 1449. The plaintiff merely is required to show by his conduct that the sexual advances were "unwelcome." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106 S. Ct. 2399, 2406, 91 L. Ed. 2d 49, 60 (1986). "[T]he question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor,* 477 U.S. at 67. The inquiry concerns whether the plaintiff indicated by his conduct that the purported sexual advances were unwelcome and not whether the plaintiff's participation was voluntary.

18

*Id.*

The evidence in this case shows that the plaintiff rejected Willie's advances and complained to management at Brent Industries. He alleges he was uncomfortable with the advances, the remarks, and the touching. He has met this element.

Concerning the third criteria, whether the harassment was based on sex, the plaintiff must show that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" *Oncale*, 118 S. Ct. at 1002. The Court in *Oncale* noted:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.

118 S. Ct. at 1002. The evidence presented in this case sufficiently shows that Willie has a sexual interest in other men. It further shows that he made specific sexual inquiries of and sexual advances toward Schneider.

Concerning the fourth criteria, whether the harassment was "sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment," the court must examine the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance. *Harris,* 510 U.S. at 21. The effect on the employee's psychological well-being is also relevant. *Id.* at 22. No single factor is required and all must be considered. *Id.* In *Harris,* the Court noted that while a "mere utterance of an . . . epithet which engenders offensive feelings in an employee, . . . does not sufficiently affect the conditions of employment to implicate Title VII," the environment does not have to be so severe as to cause a "nervous breakdown" or "seriously affect employees' psychological well-being." *Id.* at 22. The record again demonstrates that the plaintiff has met this element.

The incidents occurred during a four to five month period. They began in June 1995 at the party and continued through September when Willie called Schneider about making the complaint. There were clear sexual overtures a number of times. They were perpetrated by the CEO of the corporation. They interfered with Schneider's performance as evidenced by his statements that he was uncomfortable with Willie's actions in front of the other employees and his actions and questions in other settings. The severity is further demonstrated by Schneider's decision to complain to managers at Brent Industries and ultimately to seek additional employment.

Accordingly, Brent Industries' motion for summary judgment on Schneider's claim of a hostile work environment is due to be denied. The requisite elements of a claim have been established. Schneider has shown that Brent Industries is responsible for the actions

of Willie under 42 U.S.C. § 2000e-2(a)(1)[4] and (b),[5] since Willie must be treated as the company's proxy, there was unlawful tangible employment action, and evidence that Brent Industries was informed of Schneider's complaints and failed to take prompt remedial action.

## B. *Quid Pro Quo* Sexual Harassment

"Title VII prohibits an employer from requiring sexual consideration from an employee as a *quid pro quo* for job benefits. In order to establish a *prima facie* case of *quid pro quo* sexual harassment against an employer, the employee must prove: (1) that the employee belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment." *Sparks*, 830 F.2d at 1564. As discussed above, the plaintiff has established the first three elements. The fourth element is satisfied in a *quid pro quo* harassment case when

> [t]he employee's reaction to the harassment complained of affect[s] tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of

---

[4] Under § 2000e-2(a)(1) an "employer" is liable for its sexual harassment of its employees.

[5] Section 2000e(b) provides:

> The term 'employer' means a person engaged in an industry affecting commerce...and any agent of such a person....

21

a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment.

*Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1552 (11th Cir. 1997), *quoting Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982) (italics omitted). Thus, the harassment may be expressed or implied.

Plaintiff in this case claims it is both. He asserts that it is expressed or explicit since he was told by Culliton when he talked with him that if he (Schneider) could get through this and get on Willie's "good side and learn to play the game that [he] could go places with Brent Industries." (Plaintiff's Ex. 1, pp. 157-158). He asserts it was implied or implicit in that, by his actions, Willie showed him that to reject his sexual advances would make it hard for Schneider on the job. (Plaintiff's Br. at 34-35).

The issue revolves around whether the plaintiff can demonstrate a sufficient nexus between any job detriment and the rejection of Willie's sexual advances. What is evident when viewing the facts and reasonable inferences in favor of the plaintiff is that Schneider rejected any sexual advances by Willie and thereafter there were detriments, including that Willie verbally accosted him; supervisors at Brent Industries told him to stay away from Willie, did not want to talk about the alleged harassment or told him to try and get on Willie's good side by learning to play the game; he received a written warning that was not consistent with the company's dealings with salaried employees; and he was terminated. What is missing is the requisite nexus. There is no evidence Willie explicitly or implicitly conditioned job benefits or detriments on the acceptance

22

or rejection of sexual advances.  Human Resources Director Culliton's statement to Schneider that he should learn to play the game so he could go places with the company is not sufficient to satisfy the nexus requirement.   There is no evidence or even an allegation that Culliton was acting in concert with Willie or that he was acting as an agent on behalf of Willie.  To augment Willie's actions with the statement of Culliton would require this court to create fiction rather than find a fact.  The plaintiff has cited no authority and the court has been unable to locate any authority for the proposition that the acts and statements of one supervisor can be attributed to another supervisor who is not acting in concert with another to establish the causal relationship between the sexual advance and the tangible employment benefit or detriment.   Although Culliton's statement cannot be attributed to Willie to achieve the requisite nexus on the *quid pro quo* claim, it is evidence tending to establish a hostile work environment.

Having failed to establish this last element, the defendant's motion for summary judgment on the *quid pro quo* claim is due to be granted.

## C.  Retaliation

### 1. *Prima Facie* Case

Title VII further prohibits an employer from retaliating against an employee where the individual has engaged in a statutorily protected activity including where the person has "made a charge" under this title (participation) or where the individual has opposed any employment practice made unlawful by this title (opposition).  42 U.S.C.

§ 2000e-3(a).  To establish a *prima facie* case of retaliation, the plaintiff must show (1) that he engaged in statutorily protected expression, be it participation or opposition; (2) the employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there is some causal relation between the two events.  *Reynolds,* 115 F.3d 860, 868 (11th Cir. 1998), vacated for further consideration in light of *Faragher v. City of Boca Raton,* ___ U.S. ___, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Meeks v. Computer Associates Intern,* 15 F.3d 1013, 1021 (11th Cir. 1994).

The plaintiff asserts that the allegedly protected conduct in this case is both "opposition" and "participation."   It is "opposition" in that plaintiff alleges the retaliation was in response to his rejections of Willie's advances. It is "participation" in that he alleges that the retaliation was in response to his report of the harassment to the supervisors and the EEOC.

The first three elements for a claim of retaliation have been demonstrated. Schneider rejected Willie's advances and he reported the same to supervisors at Brent Industries. He engaged in protected activities. Premised on the deposition testimony, it is evident that Brent Industries was aware of the activity. There were specific adverse employment actions about the time Willie became aware of Schneider's complaints. A causal relationship also has been established. Schneider is merely required to show that the protected activity and the adverse action or actions were not wholly unrelated. At a minimum, the "plaintiff must generally establish that the employer was actually aware

24

of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 920 (11th Cir. 1993).  In assessing the evidence, it must be remembered that the closeness of the adverse treatment to the protected activity is an important, but not controlling, factor and may be sufficient to establish a causal connection. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-1164 (11th Cir. 1993); *but see Hamm v. Members of Bd. of Regents of State of Fla.,* 708 F.2d 647, 652 & 654 (11th Cir. 1983)(holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC).

The plaintiff's evidence shows that Willie's verbal attack on Schneider came shortly after he learned that Schneider had reported him to a supervisor. When Willie returned from Ohio, he began complaining about Schneider's performance. Within approximately two weeks, Schneider received the memo documenting the areas about which Willie was displeased. Schneider was terminated within about one month of the memo. At the time of the termination the defendant prepared a memo expressing their intention not to pay Schneider through the end of the month as originally anticipated. The defendants retort that there could be no retaliation since Brent Industries was not aware of Schneider's claims until he was informed that he was being terminated. (Defendants' Reply Brief, p. 10).  The evidence outlined above does not support this position.

## 2. The Defenses

Brent Industries further supports its claim that there was no retaliation by proffering nondiscriminatory reasons for its actions as were discussed above. The plaintiff asserts, however, that he has presented direct evidence of the defendant's retaliatory intent.

The Eleventh Circuit recently explained in an employment discrimination case the impact that direct evidence has on an analysis such as this:

> When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available. . . .The basis for the analysis is that once a plaintiff produces direct evidence of a discriminatory motive, and the trier of facts accepts this testimony, 'the ultimate issue of discrimination is proved.' . . . As such, 'the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account.'

*Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961-962 (11th Cir. 1997).

> Direct evidence of unlawful employment discrimination [or retaliation] consists of statements by a person with control over the employment decision 'sufficient to prove discrimination without inference or presumption.' . . . The statements must reflect a 'discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.' . . . . Further, the statements 'must be made by a person involved in the challenged decision.' Evidence is not direct when the statement only 'suggests discrimination' or 'is subject to more than one interpretation.' . . .

*Moore v. Alabama State* University, 980 F. Supp. 426, 433 (M. D. Ala. 1997).

The plaintiff argues that the direct evidence includes that Brent Industries told Schneider at his termination that he would receive benefits, including compensation through December 31, 1995.  However, after learning that he was considering EEOC charges and that he was going to sue on various grounds, including claims of sexual harassment and breach of contract, the company decided to terminate his benefits after December 12, 1995. (Plaintiff's Ex. 3, pp. 106-108; Plaintiff's Ex. 10). Specifically, in the memorandum signed by Tim Hubbard, the Executive Vice President, and Michael Culliton, they stated, "Upon the advice of Mr. David Carroll, Brent Industries Attorney, and faced with the threat of impending litigation, the corporation will cease to compensate Mr. Schneider after December 12, 1995." (Plaintiff's Ex. 10).  The court agrees that these facts are direct evidence of the corporation's retaliatory intent.[6] Accordingly, defendant's summary judgment should be denied. [7]

The plaintiff also asserts that Mr. Willie's testimony at his deposition, that if something were available after the downsizing, "Brad could have come back.  But not after filing these allegations.  I wasn't going to hire him back," constitutes direct evidence of retaliatory intent. (Plaintiff's Ex. 2, p. 235). The court concludes this is not direct evidence.  This comment was made eighteen months after the termination and does not specifically correlate to the complained-of detriment.  It, however, does

---

[6] The company did, however, continue paying his benefits through December 31, 1995.

[7] Even if the evidence were deemed circumstantial, as discussed below, the motion for summary judgment is due to be denied.

constitute circumstantial evidence.

As Brent Industries asserts that its actions, including Schneider's termination, were due to legitimate business reasons, it attempts to bring the case within the parameters of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case. . . ." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997), *cert. denied,* ___U.S.___, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998), *citing McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824. "The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action." *Combs,* 106 F.3d at 1528. If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by *McDonnell Douglas* "drops from the case" and "the factual inquiry proceeds to a new level of specificity." *Id., citing Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n.10, 101 S. Ct. 1089, 1094-1095 n.10, 67 L. Ed. 2d 207 (1981). "Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the *prima facie* case has been eliminated, the plaintiff has the opportunity to discredit the defendant's proffered explanations for its decision." *Combs,* 106 F.3d at1528.

> [The plaintiff] now must have the opportunity to demonstrate that the
> proffered reason was not the true reason for the employment decision....

28

> [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence*.

*Combs,* 106 F.3d at 1528, *citing Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095 (emphasis added) (citation omitted). Once the defendant has presented nondiscriminatory reasons for its actions,

> the district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'... However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's *prima facie* case taken together with rejection of the employer's explanations for its actions.  At that point, judgment as a matter of law is unavailable.

*Id.* at 1538.

This court must determine "whether the plaintiff has cast sufficient doubt on the defendant's proffered reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Id.*  The alleged detriments in this case include assaultive behavior by Willie, the company's decision to discontinue paying for the motel in Brent, a write-up that was inconsistent with company practice, and termination of employment.  The defendants proffered nondiscriminatory reasons for the actions include that the decision to discontinue payment of the hotel bill was consistent with the original offer of

29

employment, the write-up does not include any "threats of [sic] detriments" to Schneider or his job performance, and his termination was due to a reduction in force. (Defendants' Reply Br. at 5-6).

Reviewing the evidence, the court is convinced that the plaintiff has sufficiently placed in question Brent Industries motives, requiring the denial of the motion for summary judgment on this claim. Particularly, the court notes that Schneider has cast sufficient doubt on Brent Industries' nondiscriminatory reasons for the write-up and the termination. The deposition testimony indicated that the write-up was not consistent with the treatment of other salaried employees, Schneider's position as the Brent plant manager was not eliminated but filled by another person, and the Toledo position was also filled later. Further, the proffered reasons and the defendant's intent are further placed in question by the actions of Brent Industries discussed above concerning the memo where it stated that it was not going to pay Mr. Schneider after December 12. The court is not satisfied that Schneider has cast sufficient doubt on the defendant's motive in ceasing to pay for the motel. The record amply demonstrates that such action was contemplated from the commencement of the employment relationship and Schneider does not dispute that he received the stipulated increase in his salary. Therefore, under the facts presented at this juncture, the plaintiff has made a sufficient showing to survive the defendant's motion.

# V. OUTRAGE

In *Brassfield v. Jack McLendon Furniture, Inc.,* 953 F. Supp. 1424 (M.D. Ala. 1996),

the court stated:

> The Supreme Court of Alabama recognized the tort of outrage in *American Road Service Co. v. Inmon,* 394 So. 2d 361 (Ala.1980). Under the tort of outrage, liability is imposed for 'unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress.' *Id.* at 365. The court emphasized the severity of the conduct required to support an outrage claim: 'conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' *Id.*

> To establish the tort of outrage, the plaintiff must prove three elements: '(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe.' *Moore v. Spiller Associated Furniture, Inc.,* 598 So. 2d 835 (Ala.1992) (quoting *Perkins v. Dean,* 570 So. 2d 1217, 1219 (Ala.1990)).

> The Supreme Court of Alabama summarized the exceedingly narrow scope of the tort as follows:

>> [T]he tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this court has held in a large majority of the outrage cases reviewed that no jury question was presented. . . . In fact, in the 12 years since *Inmon* was decided, all cases in which this court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials . . . 2) a case where insurance agents employed heavy handed, barbaric means in attempting to coerce the insured into settling an insurance claim . . . 3) a case involving egregious sexual harassment.

*Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1044 (Ala.1993). *Brassfield,* 953

F. Supp. at 1452-1453; *see also Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752,

754 (11th Cir. 1996)(The tort of outrage applies only "in the most egregious

circumstances.").

The *Brassfield* court also noted that the Alabama Supreme Court held in *Busby v.*

*Truswal Systems Corp.*, 551 So. 2d 322, 324 (Ala.1989), that

> a plant supervisor's extreme sexual harassment of his female employees
> created a jury question as to liability for the tort of outrage. In *Busby*, the
> court found that there was evidence of at least seventeen incidents of
> harassment. The court found there was evidence that the harasser
>
>> (1) invited Busby and Money to swim in his pool in the nude with
>> him; (2) told Busby his hands were cold and asked if he could put
>> them in her pockets to keep them warm; (3) told the plaintiffs that
>> he would 'put a stick on their machines' so they could masturbate
>> while working; (4) said that he could perform intercourse as fast as
>> one of the machines at the plant could operate; (5) said that he
>> wished that the plaintiffs would come to work braless and wear less
>> clothing; (6) told one of the plaintiffs that if she had not stayed up
>> all night having sex she could do her work properly; (7) told one
>> employee that if she would give him 30 minutes with her that he
>> would fill her pants in nine months for her; (8) acted as if he was
>> going to pinch one plaintiff's breasts with a pair of pliers and with
>> his hands; (9) said that he should send one of the plaintiffs across
>> the street to where a group of men were standing because she stayed
>> sexually aroused all of the time; (10) told one of the plaintiffs that
>> he was very tired and asked her if she would accompany him to the
>> restroom and hold his penis while he urinated; (11) told one of the
>> plaintiffs that her nipples were as large as another employee's entire
>> breasts; (12) attempted to follow one of the plaintiffs into the
>> restroom and when she asked him where he was going, said that he
>> was going to help her; (13) followed one of the plaintiffs one night;
>> (14) said that a table in his office had been damaged when one of
>> the plaintiffs and a male co-employee had sex on top of it; (15)
>> openly stared at the plaintiffs' sexual anatomy; (16) put his arm
>> around the plaintiffs, grabbed their arms, and stroked their necks;

32

and (17) made other lewd remarks and gestures to the plaintiffs.

*Brassfield*, 953 F. Supp at 1453, quoting *Busby*, 551 So. 2d at 324. The *Busby* court

found that these actions could constitute extreme and outrageous conduct. *Brassfield*,

953 F. Supp. at 1453.

The *Brassfield* court denied a summary judgment motion of defendant Thornell

as to one of the plaintiff's outrage claims.    Denying the motion as to plaintiff

Brassfield's claim, the court stated, "Thornell used his position as manager to engage in

a continuous, opprobrious pattern of sexual harassment.  The Court finds that a

reasonable person should have known that emotional distress would result from

Thornell's conduct toward Brassfield, that his conduct was extreme and outrageous, and

that Brassfield suffered severe distress."[8] *Brassfield*, 953 F. Supp. at 1453-1454. With

regard to Thornell's conduct toward the second plaintiff, Pierson, the court granted

---

[8] The facts supporting the claim included:

   Thornell would ask Brassfield to rub his shoulders before he would answer her
work related questions.... He called Brassfield his 'market wife' in the presence of
visiting sales representatives.... Thornell would ask Brassfield to perform oral sex on
him.... He asked her to have sex with him-- to have *memage a trois* with Pierson [the
other plaintiff] and him at Pierson's apartment.... He asked [Brassfield] whether Pierson's
mattress was soil shielded.... Thornell asked Brassfield to have sex with him, or intimated
something of a sexual nature on a daily basis.... Several times he asked her to have sex
with him in [the president's] office.... He asked her to go skinny dipping with him
numerous times....He kissed her hand and arm without permission....He came up behind
Brassfield and 'rubbed himself against' her....In front of several other salespersons,
Thornell said 'I bet you like being spanked while you are having sex.'... He commented
that he liked Brassfield's dress because when she bent over he could see her ....

*Id.* at 1447.

33

summary judgment, finding that his "behavior was inappropriate, but the Court cannot say that his conduct was 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.'"[9] *Id.* at 1453.   The court went on to grant summary judgment as to the remaining defendants, finding that the plaintiffs had adduced insufficient evidence to maintain an outrage claim. *Id.* at 1454. The evidence included that one of the defendants, Lane McLendon,

> ... told Pierson [that] no woman would be high salesperson while he worked for McLendon Furniture.... He told her that females were lesser persons than males.... His harassment increased after she filed her EEOC charge.... On two occasions he pointed his finger at her and pretended to 'blow her away.'....
>
> Lane McLendon stated one evening that any woman wearing panties could leave early.... He allowed male salespersons to leave early if they paid him.... He asked Brassfield whether Pierson wore panties, and said that he couldn't detect any panty lines.... He asked Pierson whether the "P" on her necklace stood for prostitute.... He made comments about a nude portrait of Pierson which Pierson brought to work. He suggested the portrait be hung in the mattress department.... He laughed about Thrash's [another defendant's]

---

[9] The facts included:

Thornell required Pierson to rub his neck and shoulders before he would answer her questions pertaining to work.... During one of these incidences, Thornell pulled Pierson towards him so that her breasts pressed against his body.... On several occasions he asked Pierson to have sex with him at Pierson's apartment.... He asked Pierson whether her new mattress had been 'soil-shielded.'... Thornell asked Pierson to go skinny dipping with him, and said that he'd like to see her in a wet t-shirt.... He asked Pierson whether she forgot to wear her underwear.... He speculated about Pierson's sex life with other salespersons.... He denied Pierson's request for time off, but subsequently granted a male employee's request to be off during that same period.

*Id.* at 1446.

> comment that his lunch of chicken breasts made him think of
> Pierson.... He suggested that if he hired a female salesperson,
> Pierson would have to 'take a licking.'   He speculated about
> Pierson's sex life with other salespersons....'

*Brassfield,* 953 F. Supp. at 1446 (record references omitted).   "Lane McLendon [also]

asked Brassfield whether she wore panties.... He called her a 'stupid bitch' on several

occasions.... He joked that Brassfield was his 'market wife.'  He told Brassfield that he

would fill her orders 'when he was good and damn ready.'"   *Id.* at 1447 (record

references omitted).

In *Martin v. Norfolk Southern Ry. Co.,* 926 F. Supp. 1044 (N.D. Ala. 1996)(J.

Nelson), this court denied summary judgment on a claim of outrage in a sexual

harassment case, finding that, under the circumstances, "the court is not prepared to

hold as a matter of law that the alleged conduct in this case does not constitute conduct

'utterly intolerable in a civilized society'; thus, the determination will be left for the

jury." 926 F. Supp. at 1052.  The alleged conduct constituting sexual harassment was

extensive, including:

(1)   Hornbuckle and Summerlin offered to expose their penises to
him;
(2)   Hornbuckle and Summerlin asked him to show them his penis;
(3)   Hornbuckle grabbed at and pinched him in and around his legs
and posterior;
(4)   Hornbuckle grabbed at or swatted toward his genitals;
(5)   Hornbuckle made improper and inappropriate remarks about his
girlfriend;
(6)   Hornbuckle and Summerlin told him that he looked like he had
AIDS;
(7)   Hornbuckle called him and two other employees the "Three

35

Musketeers;"

(8) Hornbuckle told him that he was "pretty;"

(9) Hornbuckle told him that he would like to bend him over a chair and have sex with him;

(10) Hornbuckle wrapped a piece of computer paper around his head and fashioned it as a scarf;

(11) Hornbuckle threatened him that he would run him off the property if he did not "go along with him and his boys." He was referring to himself, Thomasson, and Summerlin;

(12) Thomasson grabbed at him on several occasions;

(13) Thomasson put him in a headlock on occasion;

(14) Thomasson tried to kiss him;

(15) Thomasson pinched him on occasion;

(16) Thomasson told him that he was "cute;"

(17) Thomasson stated that his girlfriend was ugly;

(18) Thomasson bent him over while Hornbuckle attempted to stick a broom handle into his anus. All three persons were fully clothed;

(19) Summerlin grabbed at him on several occasions;

(21) Summerlin asked him where he was getting his [sex] now;  and

(22) Summerlin pulled his pants down in front of him, exposing a tattoo on his buttocks;

It is undisputed that Hornbuckle and Thomasson actually touched the plaintiff; Summerlin claims that he only grabbed at Martin and did not touch him. It is also undisputed that all three defendants made offensive comments to the plaintiff. Martin admits none of the defendants propositioned him to have sex with them. There is also no evidence that Martin or any of the individual defendants are homosexual.

Martin testified that during the course of the harassment he spoke with Hornbuckle on a number of occasions about stopping the harassment to no avail. He also testified that on four or five occasions he spoke with Mr. Benson, who was second in authority to the Master Mechanic, about bringing the harassment to an end. He also requested help from Mr. Loughner, the second shift supervisor. However, neither Benson nor Loughner made any effort to stop the offensive conduct. Martin did not contact the company's Equal Employment Opportunity Department or notify the Master Mechanic. He also did not attempt to utilize the company's sexual harassment policy. Norfolk Southern alleges the plaintiff received specific training and literature regarding the harassment policy;

36

Martin claims he was merely aware of the existence of the policy, not the specifics.

926 F. Supp. at 1046-1047.

In *Parker v. The Boeing Company*, 93-U-2718-NE (J. Acker 1995), cited by the defendants, the court denied summary judgment on an outrage claim, stating, "While the outrage standard is quite high, *Busby* and *Quillen* evidence a judicial determination that the uniquely injurious nature of sexual harassment, coupled with the power disparity inherent in the supervisor/supervisee relationship, renders it particularly egregious." *Parker*, at 13-14. The court went on to find that the harasser's conduct was more than mere insults, indignities, threats and annoyances, and was "profoundly demeaning and damaging." *Id.* at 14. The complained of conduct included:

1.   Carneal 'relentlessly' asked Parker out on dates....On one occasion, he called her into his office and asked her out: [She] refused and told him his repeated requests were improper. He responded that our dating was proper because we were 'big people.' Once again [she] declined his request, and in an attempt to further dissuade him [she] reminded him [she] was dating someone else. He became furious and stated that [she] did not need 'that SOB' (referring to [her] boyfriend). Still resisting, [she] reminded him that he was dating a wonderful woman. He responded that he could date more than one person and began yelling at [her]. [She] continued to plead with him to leave [her] alone. His anger increased and he frightened [her]. When he began cursing [her she] left his office.  ....In mid-August of 1992, he told her that he was 'obsessed' with her, that she was 'the perfect woman for him,' that he thought of her 'all the time,' and that 'he must have [her].'....

2.   He made 'lewd sexual gestures' toward her....One of these gestures was sticking his tongue out at her....This behavior was witnessed by at least one other Boeing employee.

37

3.  On one occasion, he followed her to dance class...
4.  He 'would often intimidate' her by 'reminding her that her future with Boeing depended on her acquiescence to his invitation to date him.'....
5.  During a January 1993 company meeting, he referred to her as a 'pet bitch' and patted her on the back in an offensive manner....
6.  At a separate company meeting, he stated that she would be modeling her bikini for a 'beta test' of the hologram....
7.  When she developed hives, he commented that she 'was nervous because [her]...boyfriend was gone and ... [she] had not been having regular sex.'....
8.  In February 1993, he told her that he was taking a leave of absence to 'have his nuts cut off.'....
9.  On one occasion, he 'showed up at a post office' where [she] was....
10. He asked her questions about her relationship and her plans for particular weekends....

In *Busby,* which was cited by Judge Acker and herein, the court did not have to address whether the individual supervisor was liable for outrage as the individual had died and was voluntarily dismissed from the case by the plaintiff. The *Busby* court did note, however, that "there was evidence tending to support the plaintiff's claims against the supervisor." *Quillen*, 874 F. Supp. at 1298. *See supra*. In *Quillen*, the court found an issue of fact existed on an outrage claim where the harasser "used vulgar and suggestive language towards the plaintiff. He suggested they 'get naked...'; he arranged for them to share a hotel room, he appeared in the nude in front of the plaintiff, and he allegedly touched her on different occasions and in ways that offended her, including tickling, grabbing her by the waist and trying to kiss her." *Id.*

38

The undersigned magistrate judge finds that the conduct alleged by Schneider in this matter is not sufficiently "extreme and outrageous" to sustain a claim for outrage. Although reprehensible, the intensity and duration of the conduct in this case is substantially less than that in the cases outlined above where the defendants' motions for summary judgment were denied. Accordingly, the defendants' motion for summary judgment is due to be granted as to this claim.

## VI.  INVASION OF PRIVACY

"Alabama recognizes the tort of invasion of privacy, having adopted what is essentially the Restatement (Second) of Torts § 652B. That section provides in pertinent part, 'one who intentionally intrudes physically or otherwise upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person.'" *Martin*, 926 F. Supp. at 1052. In examining an invasion of privacy claim, the court must determine whether the defendant wrongfully intruded into an individual's private activities "in such a manner so as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Brassfield*, 953 F. Supp. at 1456.

The Alabama Supreme Court in *Hogin v. Cottingham*, 533 So. 2d 525 (Ala. 1988), further defined what constitutes a wrongful invasion:

> [T]here must be something in the nature of prying or intrusion and the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be, and be entitled to be, private. Two primary factors are considered

in determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information.

*Id.* at 531 (citations and internal quotations omitted).

In *Brassfield,* the court examined the Alabama cases that are instructive on a claim for an invasion of privacy.

Four cases decided by the Alabama Supreme Court supply this Court with a road map for determining whether comments and questions of a sexual nature are sufficiently outrageous to support a claim for invasion of privacy. *Busby, supra*, represents one end of the spectrum--extreme and outrageous sexual harassment will support an invasion of privacy claim. In *Phillips v. Smalley Maintenance Services*, 435 So. 2d 705 (Ala.1983), the court did not address the viability of an outrage claim, but found that an action for invasion of privacy would lie where: (1) the employer questioned a female employee two or three times a week for a period of three months behind 'locked doors' about the employee's sexual experiences; (2) the employer later made coercive sexual advances towards employee; and (3) whereupon the employee suffered severe mental trauma. However, in *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 650 (Ala.1986), although an employer repeatedly asked a female employee to 'be available,' tried to kiss her several times and later attempted to have her fired for resisting his advances, the court found that the plaintiff/employee had failed to establish a viable invasion of privacy claim. Finally, in *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123-24 (Ala.1985), the court held that the defendant's statement that the plaintiff was as 'queer as a three dollar bill' was not outrageous enough to maintain an invasion of privacy claim.

*Brassfield*, 953 F. Supp. at 1456.

As noted by Judge Acker in *Parker,* "The line between the tortious conduct in *Busby* and the merely reprehensible conduct in *McIsaac* ... is difficult to draw." *Parker,* at 10. In *Parker,* the court found the harasser's actions sufficient to defeat the

40

defendant's motion for summary judgment where the defendant was alleged to have engaged in several months of repeated requests to date the plaintiff coupled with probing questions regarding her personal relationships.  *Parker*, at 11.

The courts in *Brassfield* and *Martin* also denied summary judgment on the privacy claims.  In *Brassfield*, the court denied the motion for summary judgment of defendant Thornell, finding that the extreme and outrageous nature of the sexual harassment of Brassfield by Thornell supported a claim for invasion of privacy.[10]  *Id.* at 1456.  The court granted the motion of Thornell as to plaintiff Pierson's claim, finding the conduct was not "performed 'in such a manner so as to outrage or to cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'"[11]  *Id.* at 1457.  The court also granted the motion as to defendant Lane McLendon, whose "statements and actions which were discriminatory, but non-sexual in nature, did not 'pry' into the private aspects of [the plaintiff's] life....and whose sexually provocative questions and comments...[were] not sufficient to sustain [the plaintiff's] claim for invasion of privacy."[12]  *Id.*, 953 F. Supp. at 1457.  Lastly, the court granted summary judgment as to another defendant who commented that the chicken breasts he ate at lunch reminded him of one of the plaintiffs; joked about a nude photograph that one of the plaintiffs

---

[10]  The facts are detailed in n.8 herein.

[11]  The facts are detailed in n.9 herein.

[12]  Lane McLendon's actions are detailed on page 34 herein.

brought to work; took bets on which plaintiff would last the longest at the company; and, speculated with other salespersons about the sex life of one of the plaintiffs. *Brassfield,* 953 F. Supp. at 1446, 1457.

In *Martin,* the court held that the defendants "wrongfully invaded [the plaintiff's] solitude or seclusion by touching him in a sexual manner and making offensive comments. That decision was well supported by the evidence enumerated above. In *Parker,* the court held that the defendant's actions which included "(1) invitations to illicit intercourse; (2) an attempt to kiss plaintiff; (3) suggestive glances; and (4) pressuring his company to dismiss plaintiff in retaliation for spurning his advances" were sufficient to defeat the defendant's motion for summary judgment on an invasion of privacy claim. *Parker,* at 10.

In *Phillips v. Smalley Maintenance Services,* 435 So. 2d 705 (Ala. 1983), the court found an action for the wrongful invasion of privacy was sufficiently stated where the defendant company president subjected the plaintiff "to intrusive demands and threats, including an inquiry as to the nature of sex between her and her husband....two or three times each week..... On at least one occasion, he struck her across the buttocks with his hand. On still another occasion, he began papering his office window, thus obscuring the view of those in the surrounding area, in pursuit of what he hoped would be the consummation of lurid propositions to Plaintiff." *Id.* at 711.

42

In *Johnson v. Wal-Mart Stores, Inc.,* 987 F. Supp. 1376, 1397 (M.D. Ala. 1997), the

court, in considering an invasion of privacy claim, noted:

> The court is also persuaded by the ruling in *Cunningham v. Dabbs*, 703 So.
> 2d 979 (Ala. Civ. App.1997). There, the court found that a genuine issue
> of material fact existed as to whether the employer's sexual propositions
> and inappropriate physical contact with the employee unreasonably
> intruded into the employee's private affairs, precluding summary judgment
> on her claim of invasion of privacy.   The plaintiff alleged that the
> individual defendant frequently rubbed her shoulders and repeatedly made
> lewd and suggestive comments to her, including suggestions that they have
> sex, that they should 'slip off and go skinny-dipping,' that he '[knew] of a
> better way of getting hot and sweaty that we could enjoy,' that he would
> take her hunting and 'we'll find more to do than just wait on a deer to
> come by,' and that he told her 'just because you sleep with someone does
> not mean you have to marry them.' The plaintiff also alleged that while she
> was at lunch with a group from work, the defendant said that he would fire
> her if she got married again.  On another occasion, he stuck his tongue in
> her ear.

987 F. Supp. at 1397.

Based on the evidence in this matter, Schneider's allegations do not rise to the

level required to establish an invasion of privacy claim.  The conduct in this case does

not reach the level in *Brassfield, Phillips, Busby, Martin, Cunningham*, or *Parker*.  It was not

as intense, persistent, or repetitive.  Even considering that Willie was the CEO of Brent

Industries and on one occasion did touch the plaintiff by rubbing his shoulders, this is

not sufficient under all the circumstances to defeat the motion for summary judgment.

*But see Patterson v. Augat Wiring Systems, Inc.,* 944 F. Supp. 1509, 1522-1523 (M.D. Ala.

1996)(finding that an invasion of privacy claim should survive a motion for judgment

on the pleadings and stating that "allegations of sexual harassment are sufficient to state

43

a claim of invasion of privacy").

## VII.  BREACH OF CONTRACT

At the outset, the court must determine the applicable substantive law. Alabama's choice of law rule provides that the law of the state wherein the contract was executed is determinative of the rights and liabilities of the parties to the contract. *Industrial Chemical & Fiberglass, Corp. v. North River Ins. Co.,* 908 F.2d 825, 829 (11th Cir. 1990); *American Economy Ins. Co. v. Fort Deposit Bank*, 890 F. Supp. 1011, 1016, n.7 (M.D. Ala. 1995), *citing Harrison v. Insurance Company of North America*, 294 Ala. 387, 391, 318 So. 2d 253, 257 (1975). *See also Morris v. SSE, Inc.,* 912 F.2d 1392, 1396 (11th Cir. 1990)(In contract actions, Alabama applies the rule of *lex loci contractus*); *Kruger Commodities, Inc. v. U.S. Fidelity and Guaranty*, 923 F. Supp 1474, 1477 (M.D. Ala. 1996)("The general choice-of-law rule in Alabama is *lex loci contractus*, which provides that 'a contract is governed as to its nature, obligation, and validity by the law of the place where it was made.'").

The plaintiff argues that Ohio law should control as "the offer of employment specifically states that the plaintiff will be a manager in Ohio, not Alabama; Alabama was merely his training ground. The plaintiff was hired to work in Ohio." (Plaintiff's Br. at 55; Plaintiff's Ex. 12). He cites no authority in support of this proposition and it cannot be established under the facts in this case that the parties agreed in the letter that Ohio law would control any disputes. Accordingly, Alabama substantive law is

controlling since the offer of employment came from the Brent location, Schneider moved to Brent and he worked there for six months until his termination.

The substantive law of Alabama "has consistently held that employment contracts without a fixed term of employment are terminable at the will of either party and may be terminated for good cause, bad cause, or no cause at all." *Bates v. Jim Walter Resources, Inc.,* 418 So. 2d 903, 905 (Ala. 1982). *See Lee v. City of Gadsden*, 592 So. 2d 1036, 1038 (Ala. 1992)("The general rule is that an employment contract at will may be terminated by either party with or without cause of justification. This means a good reason, a wrong reason, or no reason."). There was no understanding, agreement, or promise concerning the term or duration of Schneider's employment in the letter offer from Brent Industries upon which the plaintiff premises his contractual claim.[13] (Plaintiff's Ex. 12). *See Lee*, 592 So. 2d at 1038 (To establish that an employment relationship is one other than one at will the plaintiff must establish, *inter alia*, that there was a clear and unequivocal offer of lifetime employment or employment of definite duration.). The offer was for employment at will. Therefore, the defendants' motion for summary judgment on the breach of contract claim is due to be GRANTED.

## VIII.  CONCLUSION

Accordingly, for the reasons stated above, defendant Brent Industries' motion for summary judgment is **GRANTED** as to Count One (*Quid Pro Quo* Sexual Harassment),

---

[13] The reference in the letter to the fact that the plaintiff's training will last at least three months does not change this assessment.

45

and **DENIED** as to Count Two (Hostile Work Environment), and Count Three (Retaliation).  Defendants Brent Industries' and Willie's motion for summary judgment is **GRANTED** as to Count Four (Tort of Outrage), Count Five (Invasion of Privacy), and Count Six (Breach of Contract).

DONE this the 11th day of September, 1998.


John E. Ott
JOHN E. OTT
UNITED STATES MAGISTRATE JUDGE

46